| Judge STEVEN R. PLOTKIN.
Plaintiffs, a group of employees of the New Orleans Fire Department, appeal a decision of the New Orleans Civil Service Commission upholding the action of the appointing authority for the New Orleans Fire Department, changing their sick leave status to leave without pay for their absence from work on April 13, 1999, meaning that they were not paid for that day. We affirm.
Facts
On April 13, 1999, only 42 of 161 employees of the Department of Fire who were scheduled to report to work actually reported. The remaining employees, approximately 74 per cent of the scheduled work force, called in sick. Upon returning to work, some of the fire fighters submitted leave slips; others did not. Some of the leave slips contained the signature of a physician; others did not. Various supervisory personnel signed the leave slips submitted by the employees.
*1045 However, when Superintendent of Fire, Warren E. McDaniels, reviewed the leave slips, he denied the request for sick leave submitted by the plaintiffs herein and placed on “leave without pay” status for that day. The only employees exempted from Superintendent McDaniels’s order were employees who were 12already on sick leave during the tour of duty immediately preceding April 13,1999.
On April 30, 1999, when they received their paycheck for the period ending April 24, 1999, the plaintiffs discovered that they had been placed on “leave without pay,” meaning that their pay was “docked” for April 13, 1999. On May 13, 1999, the plaintiffs’ attorney filed a notice with the Civil Service Commission requesting a consolidated appeal of Superintendent McDaniels’s decision. The appeal request was amended by the plaintiffs’ attorney several times prior to the hearing.
At the hearing, the plaintiffs submitted 66 written sick leave forms, and more than 100 of the plaintiffs testified concerning the reasons for their absence from work on April 13, 1999. Additionally, the parties entered into various stipulations concerning the reasons other plaintiffs took sick leave on April 13, 1999. Each witness testified to being sick on the day in question, and denied taking part in any sickout. The plaintiffs testified to suffering from a wide range of illnesses on April 13, 1999, including the flu, colds, sore throats, sinusitis, viral infections, headaches, backaches, gastritis and other stomach problems, bronchitis and other respiratory conditions, dental problems, eye problems, and other fairly common illnesses.
A large number of plaintiffs acknowledged being members of Fire Fighter’s Local 632. The majority of the plaintiffs denied participating in the picketing activities at the Fire Chiefs Conference within three days of April 13, 1999; however, some plaintiffs admitted that they participated in the picketing activities.
| aSuperintendent McDaniels testified that he had been a member of the New Orleans Fire department for more than 30 years and that he had been Superintendent of the Fire Department for more than six years. During his 30 years as a Fire Department employee, he could not recall a time where 75 percent of the employees scheduled to work on a particular day were unable to work due to illness. Superintendent McDaniels also testified that he received an anonymous phone call warning him that a sickout would occur. According to Superintendent McDaniels, the mass sick leave usage caused a potential manpower shortage that was remedied only by retaining the firefighters from the previous tour of duty for an additional tour of duty. This action cost the appointing authority between $27,000.00 and $28,000.00 in overtime pay.
Superintendent McDaniels testified that the collective bargaining agreement prohibits strikes, sickouts, and any job action. He admitted that he did not examine any of the employees and that he had no firsthand knowledge of whether any of the plaintiffs were actually sick on April 13, 1999. The chief testified that his action was taken pursuant to Civil Service Rule VIII, Section 2.2(c), which allows the appointing authority to deduct the value of absent time from an employee’s pay check in cases where an employee takes sick leave without actually being sick.
Dr. Ronald S. Landis, an industrial psychology and professor at Tulane University, prepared a statistical analysis of the probability of 119 out of 161 employees actually being sick on the same day. He looked at the first six months of attendance and calculated that the average daily attendance by the firefighters was 97.2 *1046 percent. However, on April 13, 1999 the attendance was only 26 percent.
UJoseph Matthews, the President of the Black Association of Firefighters (BA-NOF), testified that he had been a member of the Fire Department for 22 years and president of BANOF for 10 years. Mr. Matthews recalled hearing rumors about a sickout the day after the fire chief conference held the middle of April, 1999. Mr. Matthews testified that one of his members telephoned and informed him that there was going to be a sickout on April 13. He called several members who worked the affected shift and tried to encourage them not to participate in the sickout. He also stated that he saw Superintendent McDaniels at the Fire Chiefs’ conference and informed him that there were rumors of a possible sickout on the first platoon on April 13,1999.
Williams J. Sanchez, the President of Firefighters Local 632, testified that he had been a member of the New Orleans Fire Department for more than 26 years and president of Local 632 for 15 years. During that time, he recalled a few occasions when more than 50 percent of the firefighters scheduled to work failed to report to work, including one day in 1966. He did not know if that was a concerted effort; he was sick and did not go to work that particular day. Although he could not recall specific dates, Mr. Sanchez testified that it appeared to him that every four or five years “a bunch of people happen to come up sick on the same day.”
Mr. Sanchez admitted that Local 632 organized informational picketing of the Fire Chiefs’ Convention in early April of 1999. However, Mr. Sanchez testified that Local 632 was not allowed to organize a sickout because it would be a violation of their contract. He admitted that he was aware of the fact that a large number of firefighters called in sick for work on April 13, 1999 and May 5, 1999. However, he testified that Local 632 did not organize a sickout on April 13 and that he had no knowledge of anyone who was not actually sick taking sick leave in | ¡April or May of 1999. Mr. Sanchez advised his members to work if they were well and to take sick leave if they were sick.
Mr. Sanchez admitted to commenting on the fact that the members of the union had utilized their rights to use their sick leave under the Civil Service rules and the union contract in a discussion that occurred on the Bob Christopher talk show in September of 1999. A tape of portions of that talk show was played at the hearing and was transcribed and included in the record. During the course of the show, Mr. Sanchez stated that a contract had been negotiated containing a no-strike clause, and that until that contract expired, the firefighters did not have the right to strike. However, following that remark the following exchange occurred between the commentator and Mr. Sanchez:
MR. CHRISTOPHER: Then I would guess that few citizens, however empathetic they are with you and the firefighters, probably would not support sick-out actions by disgruntled firefighters. So as an organization, Bill Sanchez, what clout do you have, if any?
MR. SANCHEZ: Well, to be perfectly honest, the membership of my union without my knowledge and without my support did so in the early part of this year, during the spring of this year had two instances where they were sick enough not to come to work. Mayor Morial was shouting at the top of his lungs for me to condemn those people that did that. And I would be willing to condemn them if I thought they were so wrong. But when you get as frustrated as my people have gotten over the past four years, it’s hard for me to condemn those. While I may not con *1047 done their action, I certainly can’t condemn it.
(Emphasis added.)
When asked to explain his remark that he did not condone the firefighters’ action, Mr. Sanchez insisted that his remarks were taken out of context. He stated that there had been some off-air conversations wherein Mr. Christopher kept | ¿insisting that there was a sickout. Mr. Sanchez indicated to Mr. Christopher that the union had nothing to do with those instances. He stated that he also tried to explain that the firefighters often went to work sick because of their dedication, where normal employees would not have worked. However, he stated that when frustration starts to mount, the firefighters start to lose that dedication. For that reason, he opined that apparently many employees decided that they would not go to work when they had minor illnesses as they normally would have. He stated that by saying he did not condone their actions, he meant that if they only had a headache or toothache, they should have gone to work.
The Commission reviewed the transcript of the hearing and all the documentary evidence submitted by the parties and found that the testimony established that all but 14 of the 100 plaintiffs that filed a timely appeal worked both the preceding and succeeding tours of duty to April 13, 1999. The Commission found that further investigation was warranted prior to changing the sick leave taken by those 14 employees to leave without pay. Accordingly, the Commission ruled that the appointing authority failed to establish that those employees improperly used their sick leave and granted the appeals filed by those 14 employees.
However, as to the remaining plaintiffs, the Commission held that the appointing authority established that the remaining employees violated Civil Service Rule VIII, Section 2.2(c) and that the appointing authority took appropriate action by converting their sick leave to leave without pay. In a footnote, the Commission also denied the plaintiffs’ motion for a class action, noting that the motion was nothing more than a tactic to file otherwise untimely appeals. The plaintiffs seek a review of the Commission’s decision.
[7Burden of proof
In their first argument, the plaintiffs argue that the Commission erred in upholding the docking of eighty-six employees’ pay because the City failed to prove that each employee had improperly feigned illness. Citing Civil Service Rule II, Section 4.1, the plaintiffs argue that reducing the employees’ pay is a disciplinary action, meaning that the appointing authority is required to show that each individual employee actually committed an act that was detrimental to his employer because it impaired the efficiency and orderly operation of public service before disciplining that employee. Because the appointing authority produced no evidence to prove that the plaintiffs were not truly sick on April 13, 1999, the plaintiffs argue that the appointing authority failed to carry its burden of proof regarding each employee.
Preliminarily, it is noted that no cases were cited by either side that addressed the issue of whether changing an employee’s sick leave status to leave without pay constitutes a reduction in pay within the meaning of Civil Service Rule II, Section 4.1.[1] The term “reduction in pay” is not *1048 defined in Civil Service Rule II. However, the term is also contained in Civil Service Rule IX, the rule that governs disciplinary actions. Civil Service Rule IX, Section 1.1 lists various types of disciplinary actions the appointing authority may take against an employee. According to Section 1.1(C) “reduction in pay within the pay grade for the employee’s classification, subject to the provisions of Rule IV, Section 8” is considered a disciplinary action. Rule IV, Section 3 specifically provides as follows:
J^Section 3. PAY REDUCTIONS
3.1 An appointing authority may for cause reduce the salary of an employee within the pay grade and in conformity with salary steps established for the class. Notice of intention to effect a reduction in pay and the reasons for such action shall be given to the employee pri- or to the effective date of the reduction, and the reduction shall be reported to the Director in the manner he may prescribe.
The above section connotes that a pay reduction is considered a reduction of an employee’s salary within the pay grade. The rule does not appear to have any application to the administrative action taken by Superintendent McDaniels pursuant to Civil Service Rule VIII, Section 2.2(c). Moreover, the wording of Rule VIII, Section 2.2(c) suggests that changing sick leave to leave without pay in appropriate eases is not in and of itself a disciplinary action. Rather the Rule Provides as follows:
When an appointing authority has determined that an employee has charged an absence against sick leave although no actual illness or injury as defined in Rule I occurred, the appointing authority must deduct the value of the absent time from the employee’s accrued annual leave or pay and may also take disciplinary action as deemed appropriate under the circumstances.
(Emphasis added.) The wording of this rule conveys that, in the instant case, the action taken by Superintendent McDaniels was not disciplinary action; rather, it was administrative action. There is no indication that the action was placed or noted in the individual plaintiffs personnel files or that the action was used in any type of negative way other than to dock the plaintiffs for their misuse of sick leave. In fact, the hearing examiner stated several times that Superintendent McDaniels had not taken any disciplinary action against the plaintiffs.
Moreover, even if this court assumes arguendo that the action constituted disciplinary action and/or a reduction in pay, the record contains ample evidence to | flSupport the Commission’s conclusion that, “it was apparent that if they [the plaintiffs] were actually sick-which is highly questionable based upon the statistical information provided, and the timing of their action their illness or ailment was minor and that the true motivation for their absence was to participate in an unauthorized concerted activity, namely a sickout.” The record indicates that Superintendent McDaniels’ decision to convert the absent firefighters’ leave status from sick leave to leave without pay was based upon the large number of absences, his years of experience, the proximity in time of the absences with picketing by the membership of Fire Fighters Association Local 632 in early April during the Fire Chiefs’ Convention, and warnings that a concerted job action by his employees was to occur on April 13, 1999. Moreover, in Mr. Sanchez’s remarks made on The Christopher Show, Mr. Sanchez implicitly acknowledged that the sheer number of absences in close proximity to the picketing activity gave rise to serious suspicions *1049 that the firefighters had engaged in a sick out.
Because of the large number of absent firefighters on April 13, 1999, Superintendent McDaniels had good reason to suspect that the firefighters were participating in an illegal sickout. To determine if his suspicions were correct, Superintendent McDaniels apparently checked to see if any of the absent firefighters was already on sick leave prior to April 13, 199,9. Those employees were exempted from his order changing leave taken on that day from sick leave to leave without pay. While it is true that the appointing authority failed to submit any direct evidence to show that any individual firefighters was feigning illness, the circumstantial evidence was more than sufficient to establish by a preponderance of the evidence that the plaintiffs’ use of sick leave was nothing |inmore than a thinly guised scheme to engage in a sickout. This assignment of error has no merit.
Impact of expense
Second, the plaintiffs argue that the Commission erred by holding that the expense caused by an employee’s alleged misconduct cancels the requirement that the appointing authority spend additional funds to prove the misconduct of each individual employee. However, nothing in the decision indicates that the Commission made such a holding. Having found that the actions of the plaintiffs cost the appointing authority significant time and revenues, the Commission concluded that the appointing authority was not required to waste additional resources conducting hundreds of individual investigations. The fact that the appointing authority was required to pay approximately $28, 000 in overtime pay certainly tended to show how the sickout impaired the efficiency of the Fire Department. Moreover, misuse of sick leave by its very nature, impairs the efficient operation of the public service for which an employee is employed. City of Kenner Fire Dept. v. Kenner Municipal Fire and Police Civil Service Board, 99-86 (La.App. 5 Cir. 6/1/99), 738 So.2d 114; Sterling v. Department of Public Safety & Corrections, Louisiana State Penitentiary, 97-1959 (La.App. 1 Cir. 9/25/98) 723 So.2d 448, 454; Burke v. Baton Rouge Metro Airport, 97-947 (La.App. 1st Cir.5/15/98); 712 So.2d 1028, 1032; Ferguson v. DHHR, Office of Management and Finance, 451 So.2d 165 (La.App. 1st Cir. 1984). Moreover, we have already found that the appointing authority presented sufficient evidence to prove the alleged misconduct. No requirement that the appointing authority conduct individual investigations concerning the circumstances of each employee’s reasons Infer being absent on April 13, 1999 exists. The Commission merely found that the appointing authority’s evidence was insufficient to prove the misconduct of the 14 employees who were already on sick leave during the tour of duty immediately preceding April 13, 1999. Accordingly, we find no merit in this assignment of error.
Reduction of pay
In their final argument, the plaintiffs argue that the City may not fine or reduce a civil service employee’s pay without written notice and written reasons of the grounds for the reduction. In making this argument, the plaintiffs again argue that Superintendent McDaniels’ action violated Rule IX, Section 1.3, which prohibits the appointing authority from reducing their pay without written notice of the action and the reasons for the action. Rule IX, Section 1.3 provides:
In every case of ... reduction in pay, or fine of any employee in the classified service ... within five working days of the effective date of the action, the appointing authority shall furnish the employee and the director of *1050 Personnel a statement in writing of the reasons therefor. The notification also must advise the employee of the possible right of appeal, which must be exercised within thirty days of the disciplinary letter.
(Emphasis added.)
This assignment of error has no merit because this court has already held that Superintendent McDaniels’ action in the instant case did not constitute a reduction in pay; accordingly, the above rule does not apply to this case. Moreover, we note that the primary purpose of the notice requirement established by the above rule is to allow the affected employee to file a timely appeal of the appointing authority’s action. All of the plaintiffs in the instant case, except three, had the benefit of a full hearing before the Commission; thus, those plaintiffs | suffered no damage from the alleged violation of the rule. As for the three employees who were not timely included in the request for a consolidated appeal filed by the plaintiffs’ attorney, they became aware of Superintendent McDan-iels’ action on April 30, 1999, when they received their pay check for the affected period. Nevertheless, they sought no timely review of the Superintendent’s actions. This assignment of error has no merit.
CONCLUSION
The judgment of the Commission is affirmed.
AFFIRMED.

. Rule II, Section 4.1 provides in relevant part, "Regular employees in the classified service shall have the right to appeal disciplinary actions to the Commission, including dismissal, involuntary retirement, demotion, suspension, fine or reduction in pay. ” (emphasis added)